Cite as 2025 Ark. App. 186

# ARKANSAS COURT OF APPEALS
## DIVISION II
### No. CR-23-816

| | | |
|---|---|---|
| ZEREAK OLIVER | | Opinion Delivered March 19, 2025 |
| | APPELLANT | |
| | | APPEAL FROM THE PULASKI COUNTY CIRCUIT COURT, FIFTH DIVISION [NO. 60CR-18-3290] |
| V. | | |
| STATE OF ARKANSAS | | |
| | APPELLEE | HONORABLE WENDELL GRIFFEN, JUDGE |
| | | |
| | | AFFIRMED |

**WAYMOND M. BROWN, Judge**

Appellant Zereak Oliver was convicted by a Pulaski County jury of committing a terroristic act, a Class Y felony; fleeing, a Class D felony; and tampering with physical evidence, also a Class D felony. His sentence was enhanced by two years for using a firearm in the commission of the terroristic act, and he was sentenced to an aggregate term of twelve years' imprisonment. He argues on appeal that that the circuit court should have (1) declared a mistrial because the original jury instruction and verdict form for the terroristic-act charge did not include a material element of the offense, (2) granted his directed-verdict motion for committing a terroristic act because he was justified in using force to repel Steve Cokley's imminent use of unlawful physical force, and (3) granted his directed-verdict motion for

tampering with physical evidence because the State did not prove he was Marteo Nash's accomplice. We affirm.

Appellant's jury trial took place on December 6, 7, and 9, 2022. Appellant faced charges for first-degree murder, aggravated robbery, tampering with evidence, fleeing, and committing a terroristic act. Officer Tammy Turner of the Sherwood Police Department (SPD) testified that she was working as a patrolman on July 16, 2018, when she responded to reports of a shooting at 5905 South Woodview Drive in Sherwood, Arkansas. She said that she made contact with Cokley, whom she described as being "very frantic." Officer Turner said that Cokley stated that "they shot [his] mama." She testified that she subsequently entered the home where she located a black female, later identified as Regina Jackson, lying on the floor of a bedroom located at the end of the hallway, not breathing. Officer Turner testified that there was a rifle lying on the corner of the bed. She stated that the scene was turned over to SPD's Detective's Division. On cross-examination, Officer Turner testified that she did not know what had taken place at the residence, and she did not know who the aggressor was or who fired the first shot.

Sergeant Michael Bain of the Arkansas State Police testified that he was involved in the pursuit of a navy-blue Dodge Challenger on July 16, 2018, following a broadcast over the State Police radio that the vehicle had been involved in a shooting in Sherwood. He said that he headed in the direction the vehicle had been spotted, a service road off Interstate 630. He stated that he caught up to Trooper McDonald and Corporal Sims and that they

2

attempted to "box in the vehicle." He testified that once Trooper McDonald activated his emergency equipment, the suspect's vehicle sped off in a highly aggressive and reckless manner and that the vehicle was probably traveling twice the speed limit. Sergeant Bain stated that he was the lead vehicle once the suspect's vehicle sped off and that he had his sirens and lights activated while pursuing the vehicle. He stated that as the vehicle got onto Interstate 630 eastbound from Chester Street, he saw the passenger window come down and gave that information to other troopers. He testified that he reached average speeds of up to 109 miles an hour and that the suspect's vehicle was going faster than that. The suspect's vehicle took the 15th Street exit, and as it was at the Cumberland Street overpass, Sergeant Bain saw a dark-colored bag being thrown from the passenger's-side window, which he informed the other responding troopers and officers about. He stated that Trooper McDonald subsequently responded and said that he saw the bag and was going to stop and retrieve it. The suspect's vehicle continued on 15th Street and failed to make a sharp ninety-degree turn and ended up in the parking lot of Golden Eagle of Arkansas with nowhere to go. The occupants of the vehicle then complied with orders and were taken into custody. He testified that appellant was driving the vehicle and that Marteo Nash was the passenger. He said that the bag contained a black semiautomatic 9mm SCCY pistol and a green leafy substance consistent with marijuana. Sergeant Bain stated that the SPD subsequently took custody of the suspects and the evidence. He testified that his patrol car was equipped with a dashcam on the date in question and that it recorded from the time he initially spotted the

suspect's vehicle until the suspects were taken into custody. A flash drive showing the events was introduced and published to the jury without objection.

On cross-examination, Sergeant Bain testified that the bag was thrown from the passenger's side of the vehicle and that he did not see anything come out of the driver's side of the vehicle. He admitted that he did not know who the bag or its items belonged to. He said that appellant was compliant when he was asked to exit the vehicle.

Lieutenant Timothy Norvell of the SPD testified that he responded to a shooting at 5905 South Woodview Drive and made contact with Cokley. He stated that he left and responded to East 15th Street, where the suspect's vehicle was stopped. He said that he learned that a backpack was thrown from the vehicle during the pursuit, but that it had been recovered. Lieutenant Norvell said that he took custody of the backpack, which contained "some broken glass, baggies and green leafy material and a black 9mm SCCY handgun." He said that the handgun had one round loaded in the chamber and nine rounds were loaded in the magazine. He was able to identify the handgun at trial as the one recovered from the backpack. The handgun was admitted into evidence without objection. He said that the suspects were transported to the SPD, and the vehicle was towed the city garage in Sherwood. Lieutenant Norvell stated that he returned to the scene of the shooting to present Cokley with two separate photo lineups and that Cokley picked appellant and Nash out of the lineups. On cross-examination, Lieutenant Norvell stated that he did not know what had happened at the home prior to receiving the shooting call.

Craig Grisham, a retired detective of the SPD, testified that he was the lead detective assigned to investigate Jackson's July 16, 2018, homicide. He stated that he received background information from Cokley and learned that Jackson was his mother. He said that he spoke to Cokley outside in the driveway, and as he was scanning the area, he noticed a spent 9mm shell casing in the area Cokley stated appellant was standing when appellant fired the gun. He stated that the AR rifle found on the bed in Jackson's bedroom was the rifle Cokley indicated he and appellant had fought over. He said that he processed the scene once he secured a search warrant for the home. He testified that empty .223-caliber shell casings were found down the hallway of the home. Grisham stated that one picture showed where the bullet that struck Jackson had come through the walls. He explained the photographs taken at the scene, and those photos, along with the shell casings, and the rifle were admitted into evidence without objection. On cross-examination, Grisham testified that only one 9mm shell casing was located outside Jackson's house. He said that he could not determine whether appellant or Cokley had shot first. He stated that Cokley indicated that he was standing in the doorway of the garage when he fired at appellant. He said that Jackson was standing to the left of Cokley when she was shot. He admitted that he was unable to find the bullet that struck Jackson. He stated that he could not tell from looking at the scene whose weapon had been fired first. However, he said that Cokley fired the rifle more than once.

Cokley testified that appellant killed his mother on July 16, 2018. He stated that he knew appellant prior to that day because he had recently sold appellant a rifle a few days

before the incident. He said that he texted appellant about another rifle he wanted to sell him on the date in question. He stated that appellant came to his home, and he noticed that appellant had a firearm in his pocket. He testified that appellant came inside and walked toward the room where the rifle was lying on the bed. He described appellant as "shaking" and "nervous" as he looked at the rifle. He said appellant told him the money for the rifle was in the car but that he wanted to check the rifle out. He stated that after going back and forth about where the money was located, appellant attempted to walk out of the house with the rifle and pulled a handgun out of his pocket. Cokley said that he "rushed" appellant into the nightstand in Jackson's room, causing Jackson, who was lying down, to roll over. Jackson grabbed appellant by his dread locs (hair) and as appellant and Cokley were wrestling, the rifle ended up on the bed. Cokley subsequently was able to make appellant drop the handgun. Cokley stated that he grabbed the rifle from the bed, pointed it at appellant, and told appellant to leave. He said that Jackson stood up out the bed and told Cokley to make appellant leave. He stated that appellant ran out the garage door and towards the car. He said that he heard the car door shut, so he told Jackson to stay right there while he made sure appellant was gone. He testified that as he went toward the garage, he noticed appellant holding another firearm, coming back to the split of the garage door.[1] He stated that as he looked at appellant, appellant fired at him, and he returned fire, shooting about five or six shots towards appellant. He opined that appellant had retrieved

---

[1]The home had a two-door garage area.

the other firearm from the car. He said that he walked further into the garage and saw appellant run back to the car. He stated that by this time, his rifle had jammed, so he went back inside and noticed that his mother was on the ground, and blood was everywhere. Cokley testified that he then called 911 for help. He said that he told responding officers what happened and cooperated fully with them.

On cross-examination, Cokley testified that he did not see his mother get shot because he was outside at the time; however, he stated that appellant was the only person shooting at him. He said that when appellant came to buy the rifle, he took appellant to his room. He stated that appellant pulled a handgun out while he was inside the house, but he rushed appellant and held appellant's hand down so that appellant could not raise the handgun. He said that when they stopped wrestling, he pointed the rifle at appellant and made him leave the house.

Captain Scott Hicks of the SPD testified that he interviewed appellant on the date of Jackson's murder. He stated that during the interview, appellant admitted firing the handgun. A video of appellant's interview was played for the jury. In the interview, appellant stated that he thought Cokley was trying to rob him and Nash because Cokley came from the back with a rifle. He said they pushed past Cokley and ran back to the car and tried to leave, but before they could leave, Cokley began shooting at them. Next thing he knew, the police were behind them, and he took off because he realized he did not have a license. Appellant stated that he had never seen Cokley before. Appellant subsequently said that

7

they picked up a handgun in Cokley's house, and that is how they were able to get out.[2]

Appellant stated that the handgun shot once before it jammed. He said he was aiming toward the ground when he fired the handgun. He stated that he then gave the gun to Nash. Appellant then changed his story and said that Cokley was trying to sell them the rifle and rob them at the same time. He admitted that Cokley had pushed him into the room and that Jackson had grabbed his hair. He also admitted purchasing a rifle from Cokley for someone else before. Appellant stated that on the date in question, he went to look at the rifle, but he was not trying to buy it. He said Cokley asked him where the money was and then accused appellant of trying to rob him. He stated that Cokley then grabbed him and shoved him into the room, and Jackson grabbed his hair. Appellant said he shot once at Cokley because he was scared. Appellant was shocked to learn that his bullet killed Jackson. He then denied shooting at all. He admitted that Nash was in the car the whole time. He kept saying that Cokley shot at him first. Captain Hicks testified that Cokley was completely cooperative with the officers. On cross-examination, Captain Hicks testified that he did not know what happened in Jackson's home on July 16, 2018.

Zachary Elder, the firearm and tool-mark examiner for the Arkansas State Crime Laboratory (crime lab), testified that his tests showed that the 9mm shell casing found outside Jackson's home was fired by the pistol found in the bag that was thrown from the vehicle appellant was driving. Elder, who also has a background in autopsies, stated that he viewed

---

[2]His testimony changed from picking up the handgun before Cokley returned with the rifle to picking it up after Cokley returned holding the rifle.

Jackson's autopsy photos and opined that the injury she sustained was consistent with being shot with a 9mm as opposed to a rifle. On cross-examination, Elder admitted that he did not personally examine Jackson's body, and his opinions were based on the pictures he reviewed. He stated that he never received the bullet that struck Jackson.

Dr. Charles Kokes, a medical examiner at the crime lab, testified that he reviewed Jackson's autopsy and signed off on the report. He stated that Jackson died from a gunshot wound to her head. He said that Jackson's wounds were more consistent with being caused by a 9mm gun than a high-powered rifle. On cross-examination, Kokes admitted that he did not perform Jackson's autopsy.

At the conclusion of the State's case, appellant unsuccessfully moved for directed verdict. For the tampering-with-evidence charge, appellant argued that the bag was thrown from the passenger's window, and appellant was the driver. For committing a terroristic act, appellant contended that he was within his rights and justified in returning fire after being shot at multiple times. The defense rested without putting on any evidence.

The jury found appellant guilty of committing a terroristic act, fleeing, and tampering with physical evidence. Appellant was acquitted of aggravated robbery; the jury could not reach a verdict on the first-degree-murder charge, and a mistrial was declared for that charge. Appellant was sentenced to an aggregate term of twelve years' imprisonment. This appeal followed.

Appellant makes three arguments on appeal: the circuit court should have (1) declared a mistrial because the original jury instruction and verdict form for the terroristic-

9

threat charge did not include a material element of the offense, (2) granted his directed-verdict motion for terroristic act because he was justified in using force to repel Cokley's imminent use of unlawful physical force, and (3) granted his directed-verdict motion for tampering with physical evidence because the State did not prove he was Nash's accomplice.

Although listed as his second and third points on appeal, we first address appellant's challenges to the sufficiency of the evidence before addressing other arguments because of double-jeopardy concerns.[3] On appeal, this court treats a motion for directed verdict as a challenge to the sufficiency of the evidence.[4] In reviewing a challenge to the sufficiency of the evidence, the evidence is viewed in the light most favorable to the State, and we consider only the evidence that supports the verdict.[5] We affirm a conviction if substantial evidence exists to support it.[6] Substantial evidence is evidence of sufficient force and character that it will, with reasonable certainty, compel a conclusion one way or the other without resorting to speculation or conjecture.[7] The duty of resolving conflicting testimony and determining the credibility of witnesses is left to the discretion of the jury.[8]

---

[3]*Taffner v. State*, 2018 Ark. 99, 541 S.W.3d 430.

[4]*Armstrong v. State*, 2020 Ark. 309, 607 S.W.3d 491.

[5]*Price v. State*, 2010 Ark. App. 111, 377 S.W.3d 324.
[6]*Id.*

[7]*Id.*

[8]*Kelley v. State*, 375 Ark. 483, 292 S.W.3d 297 (2009).

Appellant argues that he was justified in using force to repel Cokley's imminent use of unlawful physical force, and therefore, the circuit court erred by not granting his directed-verdict motion for committing a terroristic act. A person commits a terroristic act if, while not in the commission of a lawful act, the person shoots at an occupiable structure with the purpose to cause injury to a person or damage to property.[9] Upon conviction, any person who commits a terroristic act is guilty of a Class Y felony if the person, with the purpose of causing physical injury to another person, causes physical injury or death to any person.[10]

Cokley testified that appellant had been ordered out of the house at gunpoint following a physical altercation. Instead of getting in his vehicle and leaving, appellant retrieved a firearm, headed back towards the home, and fired one shot at Cokley. Cokley returned fire, and appellant left the scene. When Cokley went back inside, he found his mother, Jackson, dead from the bullet fired by appellant. Although during his interview, which was played for the jury, appellant maintained that he fired the gun after Cokley started shooting at him, the jury was free to disbelieve his testimony and instead believe Cokley's testimony about what transpired and in what order. Substantial evidence supports appellant's conviction for committing a terroristic act. Accordingly, we affirm.

Appellant argues that the circuit court erred by not granting his directed-verdict motion for tampering with physical evidence because the State failed to prove that he was

---

[9]Ark. Code Ann. § 5-13-310(a)(2) (Supp. 2017).

[10]Ark. Code Ann. § 5-13-310(b)(2).

Nash's accomplice. A person commits tampering with physical evidence if he alters, destroys, suppresses, removes, or conceals any . . . thing with the purpose of impairing its verity, legibility, or availability in an official proceeding or investigation.[11] Tampering with physical evidence is a Class D felony if the person impairs or obstructs the prosecution or defense of a felony.[12]

The State contends, and we agree, that this accomplice-liability argument was not the basis of appellant's directed-verdict motion to the circuit court. A directed-verdict motion must specifically state the grounds on which the motion relies.[13] Any ground not specifically stated in such a motion is not preserved for appeal.[14] A party is bound by the scope and nature of his directed-verdict motion and cannot change the grounds on appeal.[15] At his trial, appellant argued that the bag was thrown from the passenger's window, and appellant was the driver. He has abandoned this argument and has instead argued a theory of accomplice liability. Since appellant did not raise the argument he now makes on appeal to the circuit court, it is not preserved. We affirm.

---

[11]Ark. Code Ann. § 5-53-111(a) (Repl. 2016).

[12]*Id.* § 5-53-111(b)(1).

[13]*Velazquez v. State*, 2022 Ark. App. 308.

[14]*Id.*

[15]*Id.*

Appellant also argues that the circuit court should have declared a mistrial because the original instruction and verdict form for the terroristic-act charge did not include a material element of the offense. A mistrial is a drastic remedy that should be used only when there has been an error so prejudicial that justice cannot be served by continuing the trial or when the fundamental fairness of the trial itself has been manifestly affected.[16] The circuit court is in the best position to decide the issue of prejudice because of its firsthand observation.[17] The circuit court has wide discretion in granting or denying a motion for a mistrial, and absent an abuse of that discretion, the circuit court's decision to deny a motion for a mistrial will not be disturbed.[18]

In the guilt phase, the jury received instructions on terroristic act and were asked to decide if appellant employed a firearm as a means of committing the act. They found appellant guilty and that he had used a firearm in committing the act. When the circuit court was preparing to go over sentencing instructions, the State realized that the terroristic-act instruction did not include the additional instruction for a Class Y felony (serious physical injury or death as a result of the terroristic act). The State proposed that the jury be given the verdict form again and that it make a finding on the Class Y felony. Appellant's attorney asked to circuit court to consider a mistrial for the terroristic-act charge. The

---

[16]*Parnell v. State*, 2025 Ark. App. 102.

[17]*Id.*

[18]*Id.*

attorney then asked the circuit court to allow the jury to "go back and deliberate." The circuit court agreed to allow the jury to deliberate on the terroristic-act charge the next morning. The jury deliberated further and found that appellant had caused Jackson's death as a result of the terroristic act.

The State argues that we should not reach appellant's mistrial argument because it is not preserved. We agree. Appellant did not obtain a ruling on his motion for a mistrial, and the record clearly reflects that appellant abandoned this motion by subsequently requesting that the jury be allowed to go back and deliberate. The circuit court complied with appellant's and the State's request and allowed the jury to deliberate again on the terroristic-act charge to make a finding on whether it was a Class Y felony. Because appellant was given the relief he requested, he has no basis upon which to raise this issue on appeal.[19] Additionally, appellant failed to obtain a ruling on his motion. An appellant seeking to challenge the denial of a mistrial motion must obtain a clear ruling on the issue to preserve the argument for appeal.[20] We affirm this point.

Affirmed.

KLAPPENBACH, C.J., and THYER, J., agree.

*Terrence Cain*, for appellant.

*Tim Griffin*, Att'y Gen., by: *David L. Eanes, Jr.*, Ass't Att'y Gen., for appellee.

---

[19]*See Shankle v. State*, 309 Ark. 40, 827 S.W.2d 642 (1992).

[20]*Anderson v. State*, 2023 Ark. App. 397, 675 S.W.3d 453.