Cite as 2025 Ark. App. 238

# ARKANSAS COURT OF APPEALS

DIVISION I
No. CR-24-351

| | | |
|---|---|---|
| COLTON SANDERS | | Opinion Delivered April 16, 2025 |
| | APPELLANT | |
| | | APPEAL FROM THE CRAWFORD |
| V. | | COUNTY CIRCUIT COURT |
| | | [NO. 17CR-22-856] |
| STATE OF ARKANSAS | | |
| | APPELLEE | HONORABLE CANDICE A. SETTLE, JUDGE |
| | | |
| | | AFFIRMED |

**MIKE MURPHY, Judge**

A Crawford County jury convicted appellant Colton Sanders of aggravated assault and resisting arrest. The jury sentenced him as a habitual offender to serve fifteen years' imprisonment. On appeal, Colton argues that (1) the State did not present sufficient evidence to support his convictions; (2) the court erred when it denied his request for lesser-included jury instructions; (3) the court erred when it allowed the State to use certain prior convictions against him during the guilt phase of trial; and (4) the court erred when it denied his motions for mistrial. We affirm.

## I. *Background*

The facts giving rise to this case occurred in the early-morning hours of November 3, 2022. Mark Porter testified that he received a message from Colton, who was dating and

living with Porter's daughter, Brittany Day. Mark's two granddaughters also lived with Colton. According to Mark, Colton informed him that the granddaughters' birthday party set for that weekend would no longer be held at Colton's house. Colton further told Mark that he was evicting Brittany from his house and that if Mark showed up for the party as scheduled, he would call the police.

Mark and his wife, Rhonda, began a text conversation with Brittany and asked if she was all right. During the text conversation, Brittany noted that she was scared, that she did not want to talk on the phone because she was scared Sanders would hear her, and that if something were to happen, "[they would] know who did it[.]" She further asked her parents to "[j]ust pray." Eventually, the Porters were able to get Brittany to answer their call, and they overheard Colton call Brittany a "f**king fat-a** c**t." Upon hearing this, the Porters decided to drive to Colton's house. Mark testified that they wanted to make sure their daughter and granddaughters were safe. Rhonda described Colton's tone as angry, and it made her concerned. Brittany let them in the house, and Colton immediately got off the couch and instructed them to "get the f**k out." Mark testified that Colton tried to push them out of the door, bloodying Mark's nose and knocking Rhonda into the doorframe. Colton and Mark then struggled and fell to the ground.

While Mark was on his hands and knees and attempting to get up, Colton straddled Mark's back, reached down, put his arms across Mark's throat, pulled back, and started to choke Mark. According to Mark, he struggled to breath and was making "terrible noises" as he tried to breath in and out. He heard Rhonda yell, "Stop, you're killing him[,]" but Colton

continued to choke Mark. Mark testified his vision started to turn black and he was seeing stars, but he managed to get to his feet with Colton still wrapped around his throat. Rhonda testified that she pulled Colton's shirt trying to get him off of Mark. All three eventually fell back onto a couch, and Colton's chokehold broke. As a result of being strangled, Mark sustained soft-tissue damage, and he testified that he had a sore throat and his Adam's apple was very sore for several weeks. When asked why he did not have any marks on his neck after the incident, Mark replied that it was because Sanders's arms were straight across his neck. Rhonda corroborated this testimony.

During the incident, Brittany called 911, and the audio was played for the jury. She told the operator she needed to report that "her boyfriend was being irate and hitting her parents."

Police Chief Joshua Winford responded first to the scene. He testified that the Porters were standing outside the residence when he arrived. Once other deputies arrived, they had to force entry into the home because Colton would not answer the door. Captain Michael Dawa with the Crawford County Sheriff's Office testified that they knocked on Colton's door for about five minutes. Both officers testified that Colton would not show his hands and would not submit to their authority, so he eventually had to be tased. Additionally, both officers testified that it is not common for a person claiming he was justified in his actions to avoid the police.

Dawa testified that he is also a Brazilian Jiu-Jitsu instructor for law enforcement. He explained that there are different types of chokeholds and that the one Colton used was a

3

"rear naked choke" in which one cuts off the subject's blood supply to the brain. He testified that this type of chokehold its appropriately used only in life-or-death situations. Dawa said there would be no obvious markings around the neck using this technique.

Sanders moved for directed verdict regarding both resisting arrest and aggravated assault. The court denied the motions. Sanders then put on his case. Brittany testified first and said that she is still in a relationship with Sanders and that she shares one child with him and is currently pregnant with their second child.

Colton testified in his own defense. He explained that on the night of the assault, he and Brittany were going through a tense time, so he updated the address on the Facebook invitation for the party; he did not intend to send a message to anybody directly. He denied calling Brittany any negative name. Colton testified that he was woken at 2:30 a.m. to the Porters entering his house, and Mark attempted to hit him, so he punched Mark back, and the fight ensued. He recalled that Rhonda had attacked him from behind and that Mark had tried to choke him.

Colton testified that once the fight ended, he started to call the police, but Brittany told him she had already called them and that he was to stay inside the house and wait for the police to make contact once they arrived. Colton claimed he did not hear the police knock or ask to hear his side of the story.

Colton continued to testify that he was attacked first and that he never choked Mark. He explained that he would have been unable to do so due to a back injury he sustained in the military. He said that he receives disability from the military since he left in 2013.

The State then cross-examined Colton, first inquiring about his military service. Colton claimed he had been given a general discharge under honorable conditions. However, the State had Colton read a passage from his U.S. Department of Defense ("DOD") file, which stated that his discharge was "characterized as other than honorable." Colton denied that the statement was accurate, stating he did not recognize the name of the commander. Colton then denied that his separation from the Army was based on convictions related to theft from the Army. When asked if he was stealing Army supplies and selling them to pawn shops, Colton stated, "That's not why I was separated." Colton admitted that his DOD file stated that there was "probable cause to believe [he] committed the offense of conspiracy to steal government property." Colton testified that he was convicted of one count of possession of stolen property and two counts of trafficking in stolen property. He explained that while he was, indeed, convicted of these crimes, his separation was the result of a positive drug test for a prescription drug outside of prescriptive range. He eventually admitted he had tested positive on three different occasions. Additionally, Colton confirmed that he had a felony drug conviction in 2015 and a misdemeanor theft conviction in 2018.

At the close of all the evidence, Colton renewed his motion for directed verdict, which was again denied. Colton then requested instructions on first-, second-, and third-degree assault. The circuit court denied his requests, and Colton proffered the proposed instructions. The jury returned guilty verdicts on both counts and sentenced him to serve

fifteen years on the aggravated-assault conviction and one year on the misdemeanor resisting-arrest conviction. He appealed.

## II. *Standard of Review and Applicable Law*

Motions for directed verdict are treated as challenges to the sufficiency of the evidence. *Maina v. State*, 2025 Ark. App. 38, at 4, 704 S.W.3d 364, 367. In a challenge to the sufficiency of the evidence, we review the evidence in the light most favorable to the State and consider only the evidence that supports the conviction. *Id.* The appellate courts determine whether the evidence was substantial. *Id.* Evidence is sufficient if it is of such character and force that it, with reasonable certainty, compels a conclusion one way or the other without resort to speculation or conjecture. *Id.* The credibility of witnesses is an issue for the jury. *Kinsey v. State*, 2016 Ark. 393, 503 S.W.3d 772. The trier of fact is free to believe all or part of any witness's testimony and may resolve questions of conflicting testimony and inconsistent evidence. *Id.*

## III. *Aggravated-Assault Conviction*

As charged in this case, a person commits aggravated assault if, under circumstances manifesting extreme indifference to the value of human life, he or she "[i]mpedes or prevents the respiration of another person or the circulation of another person's blood by applying pressure on the chest, throat, or neck or by blocking the nose or mouth of the other person." Ark. Code Ann. § 5-13-204(a)(3) (Supp. 2021).

Colton contends that the State did not put forth any evidence to prove the incident occurred "under circumstances manifesting extreme indifference to the value of human life."

The phrase "under circumstances manifesting extreme indifference to the value of human life" is undefined by statute but found in numerous criminal offenses involving injury or death to persons. *McCoy v. State*, 347 Ark. 913, 69 S.W.3d 430 (2002). Regardless of the offense in which it appears, the supreme court has consistently viewed the phrase as part of the proof of the actor's mental state. *Id.*

This language was challenged in *Martin v. State*, 261 Ark. 80, 547 S.W.2d 81 (1977), a battery case. In *Martin*, the appellant argued that the phrase "under circumstances manifesting extreme indifference to the value of human life" was unconstitutionally vague and overbroad. The supreme court found the statute containing the phrase valid because it does not require reasonable men to "speculate as to its common understanding or application." Specifically, the court stated, "The phrase 'circumstances manifesting extreme indifference to the value of human life' indicates that the attendant circumstances themselves must be such as to demonstrate the culpable mental state of the accused."

Our courts further interpreted the phrase by explaining that "extreme indifference" is established by actions that evidence a mental state on the part of the accused to engage in some life-threatening activity against the victim. *Porter v. State*, 358 Ark. 403, 409, 191 S.W.3d 531, 535 (2004). The supreme court in *Perry v. State*, 371 Ark. 170, 178, 264 S.W.3d 498, 503 (2007), clarified that the "extreme indifference" element is not a culpable mental state but "merely describes the dangerous circumstances generally set in motion by the defendant."

7

Turning to the facts at hand, Colton argues that the State did not present evidence beyond a reasonable doubt that Colton acted "under circumstances manifesting extreme indifference to the value of human life." To support his argument, he notes that the jury was not presented with any medical evidence nor provided examples or illustrations of the phrase "circumstances manifesting extreme indifference to the value of human life." This argument has no merit.

The State's evidence showed that Colton used a dangerous chokehold maneuver to choke Mark to near unconsciousness as Rhonda pleaded with him to stop before he killed Mark. Despite Rhonda's pleading that he could be killing Mark, Colton continued to choke Mark. Captain Dawa testified that the type of chokehold Colton used is reserved for life-or-death situations. In resolving conflicting testimony and inconsistent evidence, the jury is entitled to choose to believe the State's account of the facts. Further, as explained in *Martin*, the phrase "extreme indifference" itself provides sufficient notice to the jury of the conduct prohibited by the statute. Thus, viewing the evidence in the light most favorable to the jury's verdict, there is sufficient evidence of extreme indifference.

IV. *Resisting Arrest*

A person commits the offense of resisting arrest if he "knowingly resists a person known by him or her to be a law enforcement officer effecting an arrest." Ark. Code Ann. §

8

5-54-103(a)(1) (Repl. 2016). Colton argues the State did not put forth evidence of resistance.

To resist "means using or threatening to use physical force or any other means that creates a substantial risk of physical injury to any person." Ark. Code Ann. § 5-54-103(a)(2). Physical force is defined as "any bodily impact, restraint, or confinement or the threat of bodily impact, restraint, or confinement[.]" Ark. Code Ann. § 5-54-101(10) (Supp. 2021). Physical injury, in turn, is defined as any impairment of physical condition; infliction of substantial pain; or infliction of bruising, swelling, or a visible mark associated with physical trauma. Ark. Code Ann. § 5-1-102(14)(A)–(C).

Testimony established that Colton refused to submit to officers by pulling away from the officers. The conflict he created did not end until he was tased. Officer Winford testified he physically had to restrain Colton because "[h]e was pulling his arms away from us, putting them up into his–under his body, preventing us from pulling his arms behind his back." The fact that no physical injury occurred is immaterial; the statute requires only a substantial risk of such injury. *Hooten v. State*, 2019 Ark. App. 519, at 6, 588 S.W.3d 829, 832. The jury did not need to resort to speculation or conjecture to conclude that the physical encounter, which was heard on audio at trial, included bodily impacts that threatened at least the

---

[1]When an appellant challenges the sufficiency of the evidence, we review the sufficiency argument before a review of any alleged trial errors. *Cogburn v. State*, 2016 Ark. App. 543.

minimal level of trauma needed to inflict a physical injury such as bruising, swelling, or a visible mark.

## V. *Jury Instructions*

Sanders contends that the circuit court erred in refusing to instruct the jury on first-, second-, and third-degree assault, asserting that they are lesser-included offenses.

We recently addressed this issue in *Montgomery v. State*, 2024 Ark. App. 302, 689 S.W.3d 463, where the appellant argued that the circuit court erred in refusing to instruct the jury on lesser-included offenses of first-degree murder. We held,

> It is reversible error to refuse to give an instruction on a lesser-included offense when the instruction is supported by the slightest evidence. The circuit court may refuse to offer a jury instruction on an included offense when there is no rational basis for a verdict acquitting the defendant of the charged offense and convicting him of the included offense. Additionally, it is not erroneous for the circuit court to decline to give the proffered instruction on the lesser offense when the evidence clearly shows that the defendant is either guilty of the greater offense charged or innocent. . . .
>
> [Victim] was killed by a gunshot wound to the head. Assuming for the sake of argument that the proffered instructions were lesser-included offenses, there was no rational basis to instruct the jury on the alleged lesser-included offenses because [appellant] denied possessing and shooting a gun that day. Accordingly, whether she purposely, knowingly, or recklessly shot and killed the victim is of no significance. Therefore, the circuit court did not err in refusing to give the instructions.

*Montgomery*, 2024 Ark. App. 302, at 10–11, 689 S.W.3d at 470 (citations omitted).

Similarly, Sanders testified in his own defense and denied having choked Mark. He also claimed he was physically incapable of the act. Given his complete denial, there was no rational basis to instruct the jury on lesser-included offenses.

## VI. *Prior Convictions*

Colton argues that the circuit court erred by allowing the State to cross-examine him regarding prior convictions that stemmed from his time during the military. In response to Colton's objection, the circuit court concluded that Colton's testimony about his military service opened the door. Specifically, it found,

> [W]hat's happened here is that by having him testify about him being in the military and bolstering his character and credibility with that testimony, he has opened the door to this. And so there's no stopping—if he was convicted of theft from the Army after he's denied it, he can ask about it.

Circuit courts have wide discretion in their evidentiary rulings, and there must be an abuse of discretion, as well as a showing of prejudice, to justify reversal of that decision. *Delp v. State*, 2011 Ark. App. 108, at 5.

Colton's argument is based on Rule 609(b) of the Arkansas Rules of Evidence, which states,

> (b) *Time Limit.* Evidence of a conviction under this rule is not admissible if a period of more than ten [10] years has elapsed since the date of the conviction or of the release of the witness from the confinement imposed for that conviction, whichever is the later date.

The State concedes that because the convictions were entered on October 10, 2013, their use during the trial on February 1, 2024, is outside the permitted time limit of Rule 609(b). Instead, the State argues that by testifying to his disabled-veteran status, Colton put his character at issue. We agree.

Under Arkansas Rule of Evidence 404(a)(1), evidence of a person's character or a trait of his character is not admissible for proving that he acted in conformity therewith on a particular occasion, except by the accused or by the prosecution to rebut the same. Thus,

11

"[o]nce the admissibility of character evidence is established under Rule 404, Rule 405 establishes the methods of proof which may be utilized." *Smith v. State*, 316 Ark. 407, 411, 872 S.W.2d 843, 845 (1994). Rule 405(a) provides that once character evidence is admissible, one permissible method of proof is reputation or opinion testimony and, further, that "[o]*n cross-examination, inquiry is allowable into relevant specific instances of conduct*." *Smith*, 316 Ark. at 411, 872 S.W.2d at 845 (quoting Ark. R. Evid. 405(a)) (emphasis in the original).

This case turns solely on the credibility of the victim versus that of Colton. By testifying both that he injured his back while serving our country and that he was honorably discharged from the military, even in the face of evidence to the contrary, Colton inherently made himself appear admirable and honorable, bolstering his credibility. Additionally, Colton's testimony that he is incapable of performing the chokehold maneuver due to an injury sustained in the military directly attacks the Porters' credibility. Accordingly, Colton opened the door to an attack on his credibility by specific instances of conduct, including the prior convictions. These specific instances, including the convictions, are relevant to rebut his assertion that his military service ended under honorable circumstances because they are *directly related* to Colton's military service and his honorable-discharge claim that he used to bolster his character during his testimony.

Accordingly, the circuit court did not abuse its discretion in allowing the State to inquire about the convictions on cross-examination.

VII. *Motions for Mistrial*

Colton made three motions for mistrial. A mistrial is a drastic remedy that should be used only when there has been an error so prejudicial that justice cannot be served by continuing the trial or when the fundamental fairness of the trial itself has been manifestly affected. *Oliver v. State*, 2025 Ark. App. 186, at 13. The circuit court is in the best position to decide the issue of prejudice because of its firsthand observation. The circuit court has wide discretion in granting or denying a motion for a mistrial, and absent an abuse of that discretion, the circuit court's decision to deny a motion for a mistrial will not be disturbed. *Id.*

Colton's first mistrial motion came during Rhonda's testimony. The State asked Rhonda why she was concerned for her daughter, and Rhonda responded, "I've heard stories from her in the past with him." Colton immediately objected to the testimony as hearsay and moved for a mistrial. The court denied Colton's mistrial motion but admonished and instructed the jury to "disregard the . . . statement with regards to statements from Brittany from the past." Colton argues this was not enough because at that point, the jury had already heard the statement implying an abusive history, which could not be cured by a simple instruction to disregard.

While there is always some prejudice that results from the mention of a prior bad act in front of the jury, if the infraction induces only minimal prejudice, the proper remedy is an admonition or instruction to the jury to disregard the remark. *McClendon v. State*, 2019 Ark. 88, at 7, 570 S.W.3d 450, 455. In *Strawhacker v. State*, we considered the denial of a mistrial motion where a detective's testimony mentioned that the defendant had a prior

13

conviction for third-degree battery. 304 Ark. 726, 729, 804 S.W.2d 720, 722 (1991). In affirming the circuit court's denial, we explained that the prosecutor's action was inadvertent and did not deliberately elicit the prejudicial response. *Id.* We further held that any resulting prejudice was cured by the court's admonition. *Id.*

Rhonda's comment was not deliberately induced by the State. Her later testimony demonstrates that, in asking her why she was concerned for her daughter, the prosecutor was trying to elicit testimony about text messages Rhonda had received from her daughter that evening. Further, the potential prejudice was minimal. The comment at issue was vague and nonspecific. Thus, the court correctly concluded that an admonition was sufficient to cure any prejudice.

The second mistrial motion came in response to the State's use of the prior convictions discussed above. Because we find the evidence was properly admitted, the circuit court did not abuse its discretion by denying Colton's mistrial motion. *See Hudson v. State*, 85 Ark. App. 85, 98, 146 S.W.3d 380, 388 (2004) (holding there was no abuse of discretion in the circuit court's denial of Hudson's motions for a mistrial given that the challenged evidence was properly admissible).

The final motion occurred once closing arguments were made and the jury retired to deliberate. Colton moved for a mistrial on the basis that the State used language intended to inflame the jury. The circuit court admitted that the State's language was "pretty strong" but then acknowledged that both sides were "a little bit strong" and denied the motion.

Our supreme court has consistently held that a motion for mistrial must be made at the first opportunity. *Sweet v. State*, 2011 Ark. 20, at 22–23, 370 S.W.3d 510, 525. The reason for this is that a circuit court should be given an opportunity to correct any perceived error before prejudice occurs. *Id.* In *Ellis v. State*, 366 Ark. 46, 49, 233 S.W.3d 606, 608 (2006), defense counsel did not move for mistrial until the prosecutor had already asked three additional questions that were all unrelated.

Here, Colton did not object during the closing argument. Instead, he waited until after the argument was over and the jury had been given its final charge and had retired to deliberate. At that point, his motion was too late.

Affirmed.

KLAPPENBACH, C.J., and ABRAMSON, J., agree.

*Casey D. Copeland*, for appellant.

*Tim Griffin*, Att'y Gen., by: *Joseph Karl Luebke*, Ass't Att'y Gen., for appellee.